UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLOTTE A. QUALLS, | ) | |
| | ) | No. 14 CV 2526 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) | |
| | ) | April 8, 2016 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Charlotte Qualls applied for disability insurance benefits ("DIB") claiming that she is disabled by diabetes, hypertension, and back pain. After the Commissioner of the Social Security Administration denied her application, Qualls filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment.[1] For the following reasons, Qualls's motion for summary judgment is denied, the government's motion is granted, and the Commissioner's decision is affirmed:

### Procedural History

Qualls applied for DIB in July 2010 claiming a disability onset date of December 31, 2009. (See Administrative Record ("A.R.") 218.) After her application was denied initially and upon reconsideration, (id. at 145-46), Qualls sought and

---

[1] Despite receiving two extensions of time to respond to Qualls's motion, (R. 17, 20), the government filed its brief a day late, (R. 24). The court accepts and considers the government's late-filed brief in this instance, but admonishes the government against filing late submissions without leave of court.

was granted a hearing before an administrative law judge ("ALJ"), (id. at 167, 188). The ALJ held a hearing on July 16, 2012, at which Qualls, a medical expert ("ME"), and a vocational expert ("VE") testified. (Id. at 70-143.) On November 19, 2012, the ALJ issued a decision finding that Qualls is not disabled. (Id. at 50-69.) When the Appeals Council denied Qualls's request for review, (id. at 1-6), the ALJ's denial of benefits became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Qualls filed this lawsuit seeking judicial review of the Commissioner's decision, (R. 1); *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 10); *see* 28 U.S.C. § 636(c).

**Facts**

Qualls, who was 55 years old at the time of the hearing, most recently worked as a cashier at a grocery store from 2004 until December 2009. (A.R. 271.) She also worked briefly as a file clerk in 1998. (Id. at 132-33.) She stopped working when she moved to Tennessee at the end of 2009 and has not worked since. (Id. at 82-83.) She returned to Illinois in 2011. (Id. at 83.) At the hearing before the ALJ, Qualls presented both documentary and testimonial evidence in support of her claims.

**A. Medical Evidence**

Qualls received treatment for diabetes and hypertension at Lifespan Health, a clinic in Tennessee, in January, July, and October 2010. (A.R. 401-03, 469-75.) Her records from those visits show that she took oral medications to manage her diabetes and complained of sleepiness on one occasion. (Id.) Shortly after her last visit in October 2010, Dr. John Woods performed a consultative examination of

Qualls and reported that she suffered from diabetes, problems sleeping, hypertension, and back pain. (Id. at 406.) He noted that she was taking medication for diabetes but had been off insulin for over a year because she lacked insurance. (Id.) He also wrote that she admitted to noncompliance with a diabetic diet and complained of symptoms including tingling in her hands and arms, fatigue, and blurry vision. (Id.) But Qualls reported that these symptoms had only a minor effect on her ability to perform work duties. (Id.)

Regarding her fatigue, Qualls told Dr. Woods that she began having problems sleeping in May 2008. (Id.) Although she reported falling asleep during the day "when just sitting around," she felt her sleepiness had a minor effect on her ability to perform work duties. (Id.) She also reported that because of her hypertension, stress sometimes caused dizziness, headaches, vision problems, tachycardia, and shortness of breath. (Id.) But again, she said that these symptoms had only a minor effect on her ability to perform work duties. (Id.) As for her back, Dr. Woods noted that Qualls said she was hospitalized in 2008 for back pain, but was not given a diagnosis. (Id.) She reported that her back pain was worsening and "had a major [e]ffect on her ability to perform general tasks and work duties." (Id.) For example, she said her back pain prevented her from sitting comfortably for more than two hours without having to get up. (Id. at 407.)

After performing a physical examination, Dr. Woods reported that Qualls had no spinal tenderness or spasms, normal strength and range of motion in all major muscle groups, a normal gait, and normal mobility. (Id. at 408-09.) He wrote that

Qualls was obese, but that her obesity did not adversely affect her ability to walk, twist, turn, bend, or lift. (Id. at 410.) Dr. Woods concluded that: Qualls could occasionally lift or carry for up to one-third of an eight-hour workday with no restrictions; frequently lift or carry a maximum of 10 pounds for one-third to two-thirds of an eight-hour workday; stand or walk with normal breaks for a total of six hours in an eight-hour workday; and sit with normal breaks with no restrictions. (Id. at 411.)

Dr. Seth Osafo performed another consultative physical examination of Qualls in January 2011. (Id. at 415.) He reported that she complained of daily pain in her back, shoulders, and feet, which was aggravated by prolonged standing, lifting, and bending. (Id.) She also said she was sleepy "all of the time." (Id.) Dr. Osafo observed no gait disturbance and noted that she ambulated without an assistive device. (Id.) He wrote that she can walk two miles, lift 10 pounds, shower, get dressed, grocery shop, and cook. (Id.) A physical examination found no spinal or joint tenderness, normal gait, normal joint range of motion, a negative straight-leg raising test, and normal muscle strength. (Id. at 417.) Dr. Osafo concluded that Qualls's low-back, shoulder, and foot pain is related to degenerative arthritis which was "clinically stable" at the time of the examination. (Id.) He further opined that she could sit, stand, walk, carry, and handle objects without limitations. (Id.)

Dr. George Andrews completed a state request for medical advice ("RMA") in February 2011 and concurred with Dr. Osafo's findings. (Id. at 435-37.) Another state medical consultant, Dr. Francis Vincent, agreed with Dr. Andrews's RMA in

August 2011. (Id. at 463-65.) Around that time, Qualls went to Silver Cross Hospital complaining of bilateral knee pain. Nurse Practioner ("NP") Dolly Agba obtained x-rays of Qualls's knees, finding that the bony structures appeared intact, that there was no evidence of joint effusion, and that joint spaces were adequately maintained. (Id. at 514.) An arterial evaluation also came back normal and a doppler venous ultrasound did not reveal any evidence of deep venous thrombosis. (Id. at 515.)

In September 2011, Qualls visited Will County Community Health Center complaining of leg pain and numbness in her left leg. (Id. at 502.) She was prescribed Tylenol #3 and Neurontin, (id.), but she returned to the health center in March 2012 complaining of left knee pain and reported that the Neurontin did not help, (id. at 498). NP Agba recommended that she continue to take Tylenol #3 and referred her to a podiatrist. (Id. at 499.) A couple weeks later Qualls saw a podiatrist, Dr. Daniel Helmer, who found that Qualls exhibited evidence of "drop foot" (difficulty lifting the front part of the foot)[2] in her left foot. (Id. at 479.) He diagnosed her with neuroma formation, nerve entrapment, and neuropathy peripheral to vascular disease, and prescribed quinine tablets for her leg cramping. (Id.) He later administered injections into her left foot on a few occasions in April 2012, and noted improvement in her condition. (Id. at 493-95.)

---

[2] *See* Mayo Clinic, "Foot Drop," www.mayoclinic.org/diseases-conditions/foot-drop/basics/definition/con-20032918 (last visited Apr. 7, 2016).

5

## B.     Qualls's Hearing Testimony

At her hearing before the ALJ in July 2012, Qualls testified about how her impairments affect her daily life. She said that she stopped driving because she fell asleep too frequently, (A.R. 76), and that she gets sleepy if she is not moving around, (id. at 103-04). She explained that she does laundry, vacuums, mops, goes grocery shopping, and cooks sometimes, (id. at 77-78), but that her legs feel numb after she stands or walks for 30 to 60 minutes, (id. at 84-85). She takes Tylenol #3 when the pain is especially bad, which she said is about twice a week. (Id. at 87-88.) In addition to pain medication, Qualls testified that the foot injections administered by Dr. Helmer have eased her foot pain. (Id. at 88-90, 97.) In fact, although she said that she still gets cramps, Qualls said that her foot no longer bothers her and "isn't a major problem for [her] these days." (Id. at 97-98.) When questioned by her attorney, Qualls testified that she no longer takes medication for back pain because her back also "hasn't bothered [her]." (Id. at 102.)

As for her work history and capabilities, Qualls testified that she last worked as a cashier at Meijer in December 2009. (Id. at 81.) When she returned to Illinois in 2011, she looked for work again but did not get hired. (Id. at 83.) She testified that she could no longer work because she has difficulty standing and looking at a computer screen. (Id. at 84.) She also said that she cannot work because her vision is impaired and she is "always sleepy." (Id. at 90.) When the ALJ asked if there were "any other reasons [she] can't work," Qualls said "not that I know of." (Id. at 93.) During examination by her attorney, Qualls at first said she could work full-

time as a housekeeper. (Id. at 95-96.) But upon further questioning, she testified that she would be unable to do so because of her inability to stand for long periods of time. (Id. at 96.)

## C.     Medical Expert Testimony

The ALJ heard testimony from ME Dr. Charles Metcalf. (A.R. 104-124.) First, the ALJ asked the ME a number of questions regarding Qualls's diabetes. The ME testified that her diabetes is "under fair control" and noted that Dr. Helmer found some decreased balance in both her feet. (Id. at 106.) The ME also pointed out that Dr. Helmer reported some muscular weakness in Qualls's left foot and diminished pulses in both feet. (Id.) He agreed with Dr. Helmer's diagnosis of diabetic neuropathy, (id. at 107, 111-12), but could not determine the extent of the neuropathy, (id. at 111-12). He went on to testify that there was no reason to think Qualls's condition was so extreme as to meet or equal a listing, but that based on records from Dr. Helmer, she should be limited to light work and lifting 25 pounds occasionally and 10 pounds frequently. (Id. at 112-13.)

The ME further opined that Qualls could stand or sit for six hours in a day, but would need an option to change position from sitting to standing because of her "possible foot drop" and leg weakness. (Id. at 113.) When the ALJ asked for clarification regarding the sit/stand option, the ME explained that Qualls should not stand for more than an hour at a time without the option of changing positions. (Id. at 114.) He said that the sit/stand option was not "a matter of resting" but of changing positions "to assist in balance and . . . comfort" and to avoid having to

7

stand for more than two hours uninterrupted. (Id. at 114-15.) The ME further opined that she could occasionally stoop, crawl, crouch, kneel, and bend, occasionally use ramps and stairs, and never climb ladders, ropes, or scaffolding. (Id. at 115-16.) Finally, the ME said Qualls should have no exposure to dangerous moving machinery. (Id. at 116.)

Qualls's attorney asked the ME whether the medications she took, either singly or in combination, would lead to sleepiness or tiredness. (Id. at 122.) The ME responded that except for Tylenol #3, which should be taken at bedtime anyway, none of her medications would concern him for causing day-time drowsiness. (Id. at 123.)

### D. Vocational Expert Testimony

Next the ALJ called a VE to testify regarding the types of jobs a person with certain hypothetical limitations would be able to perform. After first asking the VE to categorize Qualls's past work, the ALJ then asked him to assume a hypothetical person of Qualls's age, education, and work history, who can frequently lift and carry no more than 10 pounds, has no limitations as to occasional lifting and carrying, can stand and walk a total of six hours in an eight-hour workday, has no limitations on sitting, and has no postural limitations. (A.R. 134.) The VE responded that such an individual could work as a file clerk as Qualls previously performed it, or work as an assembler, packager, or mail clerk. (Id. at 136-38.)

The ALJ then asked the VE to consider a hypothetical individual with the same age, education, and work history as Qualls who could perform work at the

light exertional level, but who would need the option to change position after standing for one hour. (Id. at 138.) The ALJ further specified that in changing positions, the person would not be off task. (Id. at 139.) The hypothetical person would be able to occasionally stoop, crawl, crouch, kneel, balance, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds, and have no exposure to dangerous moving machinery. (Id. at 138.) The VE answered that such a person would be able to do Qualls's past work as a file clerk both as she performed it and as performed in the general population. (Id. at 139.) The VE also said that the individual could work as a self-service sales attendant, cafeteria attendant, and mail clerk. (Id. at 140.)

Lastly, the ALJ asked if being off task for 20 percent or more of the time or needing two 10- to 15-minute breaks beyond what is usual and customary would change the VE's answers to either of the previous hypotheticals. (Id. at 140-41.) The VE answered that either of those restrictions would preclude competitive employment. (Id. at 141.)

### E. Post-Hearing Evidence

After the hearing, Qualls submitted x-ray results from a July 2012 visit to Silver Cross Hospital. (A.R. 523-24.) The x-rays revealed some degenerative changes in her left shoulder joint and "moderate to severe multilevel cervical spondylosis." (Id.)

9

## F. ALJ's Decision

On November 19, 2012, the ALJ issued a decision finding that Qualls is not entitled to DIB. (A.R. 53-65.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. §§ 404.1520(a); *Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ found at step one that Qualls has not engaged in any substantial gainful activity since her alleged disability onset date, (A.R. 55). At step two the ALJ found that Qualls suffers from the severe impairments of diabetes with sensory neuropathy, cervical spine spondylosis, left knee impairment, and obesity. (Id.) At step three the ALJ found that none of Qualls's impairments are of listings-level severity, either individually or in combination. (Id. at 56-57.) Before turning to step four, the ALJ determined that Qualls has the residual functional capacity ("RFC") to perform light work with the option to change positions after standing for one hour, and can occasionally climb ramps or stairs, stoop, crouch, crawl, kneel, and balance, but never climb ladders, ropes, or scaffolds. (Id. at 57-63.) The ALJ also determined that Qualls should have no exposure to dangerous moving machinery. (Id. at 57.) Then at step four, the ALJ concluded that Qualls is able to return to her previous work as a file clerk, or in the alternative, can perform other jobs which exist in the regional economy. (Id. at 63-65.) Accordingly, the ALJ found that Qualls is not disabled and denied her application for DIB. (Id. at 65.)

## Analysis

Qualls argues that the ALJ did not adequately consider her recent x-rays in determining her RFC, erred in assessing her need to alternate between sitting and

standing, and failed to properly analyze her credibility. (R. 15, Pl.'s Mem. at 1.) This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (internal quotation omitted). Under that standard, the court will not substitute its judgment for the ALJ's or reconsider evidence. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence" and will ensure that the ALJ built a "logical bridge from the evidence" to the conclusion. *Minnick*, 775 F.3d at 935 (internal quotations and citations omitted).

**A.     RFC Assessment**

Qualls first argues that the ALJ failed to adequately consider x-ray results submitted after the hearing showing that she has moderate to severe spondylosis and degenerative arthritis in her shoulder. (R. 15, Pl.'s Mem. at 8-11.) Specifically, Qualls contends that the ALJ "played doctor" in finding that she still has the ability to perform light work despite these conditions, and that the ALJ should have submitted the post-hearing records to an ME. (Id. at 9.)

The ALJ did not "play doctor" here. An ALJ improperly "plays doctor" if she substitutes her own judgment for a physician's opinion and makes an independent medical finding without relying on other medical evidence in the record. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). This is not a case where the ALJ afforded greater weight to non-examining opinions over a treating source's

opinion without adequately explaining why. *See Campbell v. Astrue*, 627 F.3d 299, 308-09 (7th Cir. 2010). Nor did the ALJ independently reach a conclusion which contradicts medical opinions in the record. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Rather the ALJ acknowledged the x-ray results but concluded, based on multiple medical opinions and the record as a whole, that greater limitations beyond those prescribed for light work were unnecessary. (A.R. 60, 61, 63.)

In *Olsen v. Colvin,* 551 F. App'x 868 (7th Cir. 2014)*,* the Seventh Circuit rejected a claimant's argument that the ALJ played doctor by interpreting MRIs as showing mostly mild abnormalities. *Id.* at 874-75. The court found that it was the claimant's burden to present medical evidence supporting her claim of disability, and that her challenge of the ALJ's analysis of MRIs fell short because she "ha[d] not made a serious effort to show that the ALJ's conclusion [was] *incorrect.*" *Id.* at 875 (emphasis in original) (citation omitted). Similarly, Qualls did not provide an opinion from a physician about the conclusion to be drawn from the various x-rays. *See id.* Granted, here the x-ray results indicate that Qualls has moderate to severe cervical spondylosis, which is more than a "mild" abnormality. (A.R. 524.) But the ALJ gave valid reasons for why she nonetheless concluded that Qualls's back condition is not disabling. She cited records showing that Qualls had a normal gait, no spinal tenderness or spasms, and normal range of motion in all joints. (Id. at 57, 60-61.) She pointed out that there is no record of further treatment accompanying the x-rays, and that the medical record as a whole only reflects conservative and

infrequent treatment for her symptoms. (Id. at 60-61); *see Olsen*, 551 Fed. Appx. at 875 (finding significant that the physicians who ordered diagnostic testing only recommended conservative treatment).

The ALJ further highlighted the fact that Qualls did not undergo any physical therapy or ongoing treatment for her back pain. (See A.R. 61.) The ALJ also cited multiple state agency medical opinions and ME testimony finding Qualls capable of light work with certain limitations. (Id. at 62.) She acknowledged that Qualls reported having back pain, (id. at 60-61), but explained that the medical evidence and Qualls's daily activities did not support any greater limitations than provided in her RFC, (id. at 61). Indeed, Qualls explicitly denied having severe back pain at the hearing, which occurred *after* the x-rays were taken. (Id. at 102.)

Nevertheless, Qualls contends that the ALJ should have submitted the x-rays to an ME for review. (R. 15, Pl.'s Mem. at 10.) While an ALJ must summon an ME if one is necessary to provide an informed basis for determining whether the claimant is disabled, *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000), Qualls has not shown that a review by another ME was necessary, *see Dardon v. Colvin*, No. 12 CV 50398, 2015 WL 1915606, at *4 (N.D. Ill. Apr. 27, 2015) (citing *Richardson v. Astrue*, No. 11 CV 1002, 2012 WL 4467566, at *8-9 (S.D. Ind. Sept. 26, 2012) (no error in failing to call ME when no showing that the ALJ disregarded evidence or failed to explain reasoning)). More expert review would have been required if no medical evidence existed regarding Qualls's RFC. *See Martinez v. Colvin*, No. 12 CV 50016, 2014 WL 1305067, at *14 (N.D. Ill. Mar. 28, 2014). In *Green*, which

Qualls relies on heavily, the ALJ erred because he decided the RFC without *any* apparent medical opinion. 204 F.3d at 781. But here, Qualls has not shown that it was necessary for the ALJ to call an ME to review the x-ray results. *See Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007) (particularly in counseled cases, the claimant bears the burden to introduce objective evidence that the ALJ should have developed the record further). The Seventh Circuit "recognize[s] that, because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). Moreover, regulations provide that the decision to use an ME is discretionary, 20 C.F.R. § 416.927(e)(2)(iii), and as discussed above, the evidence shows that the ALJ was well within her discretion in not calling on another ME given the substantial evidence that Qualls's back and shoulder pain was not so severe or disabling as to disqualify her from light work. *See Vaden v. Astrue*, No. 12 CV 284, 2013 WL 1319617, at *6 (S.D. Ind. Mar. 29, 2013). Because the RFC is adequately supported, the court affirms the ALJ's RFC assessment.

**B.      Sit/Stand Option**

Qualls next challenges the ALJ's determination that Qualls should be allowed to change positions from sitting to standing, and vice versa, after one hour, but that she could remain on task when changing positions. (R. 15, Pl.'s Mem. at 11-13.) More specifically, Qualls argues that the ALJ failed to get information from the ME regarding the frequency and duration of her sit/stand option, which are

relevant to determining whether she can perform light work. (Id. at 12.) This argument overlooks the ME's testimony that she can stand for "no more than an hour at a time without the option of changing positions." (A.R. 114.) The ME also testified that she can stand for six hours or sit for six hours during the day, and that she is capable of performing light work. (Id. at 113.)

Qualls seems to take issue in particular with the ALJ's finding that she would not be off task when changing positions. According to Qualls, the ALJ should have secured more information from the ME regarding how long it would take Qualls to change positions. (See R. 15, Pl.'s Mem. at 12.) But the ME specifically explained that for Qualls, the sit/stand option was not "a matter of resting," but rather just changing positions so that she does not need to stand "uninterrupted." (A.R. 114-15.) Based on this testimony, it was reasonable for the ALJ to conclude that changing positions would not cause Qualls to be off task for any significant amount of time. Although the ALJ did not explicitly ask the ME about whether Qualls would be off task while changing positions, the ALJ was entitled to draw the common-sense conclusion that because the ME said Qualls did not need to rest during the transitions, she would be able to stay on task. *See Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). The court will not "nitpick" the ALJ's reasoning by finding reversible error here. *See id.*; *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Because the ALJ reasonably based her finding on the ME's testimony, the court affirms the ALJ's conclusions regarding Qualls's sit/stand option.

## C. Limitations Analysis

Lastly, Qualls contends that the ALJ should have credited her allegations regarding pain and fatigue. (R. 15, Pl.'s Mem. at 13-15.) Before discussing the merits of her argument, the court notes that the Social Security Administration recently issued a Social Security Ruling ("SSR") updating its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new SSR 16-3p supersedes SSR 96-7p and eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's decision in this case, applying a new SSR to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *See Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). In determining whether a new rule constitutes a clarification or a change, courts give "great weight" to the agency's expressed intent to clarify a regulation "unless the prior interpretation . . . is patently inconsistent with the later one." *Id.; see also First Nat. Bank of Chi. v. Standard Bank & Trust,* 172 F.3d 472, 479 (7th Cir. 1999); *Homemakers N. Shore, Inc. v. Bowen,* 832 F.2d 408 (7th Cir. 1987). Here, the Administration specified that the new SSR is intended to clarify its application of existing rules and to "more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2016 WL 1119029 at *1. The two SSRs are also substantially consistent, both in the

two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a claimant's symptoms. Therefore, the court applies SSR 16-3p in analyzing Qualls's challenges to the ALJ's evaluation of her pain and fatigue complaints.

The court finds that Qualls's arguments fall short under both SSR 16-3p and the superseded SSR 96-7p. This court is required to be deferential in reviewing the ALJ's evaluation of Qualls's symptoms. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *see also Stepp*, 795 F.3d at 720. Although the court will scrutinize the ALJ's assessment to determine whether it conveys any "fatal gaps or contradictions," it will "give the opinion a commonsensical reading rather than nitpicking at it." *Castile*, 617 F.3d at 929 (quotation and citation omitted). In this case, the ALJ provided well-supported reasons for deciding that Qualls's complaints of pain are not as severe as she alleges, including inconsistencies in her own testimony. (A.R. 61-62.) For example, the ALJ noted that Qualls complains of foot pain, but she testified at the hearing that her foot stopped hurting. (Id. at 58.) Indeed, Qualls said that although she still has leg cramps, her foot "doesn't bother [her]" and "isn't a major problem for [her] these days." (Id. at 97-98.) She also testified that she no longer takes medication for back pain because her back also "hasn't bothered [her]." (Id. at 102.) Given Qualls's express denial of severe pain in her foot and back during the hearing, the ALJ was entitled to determine that her pain was not debilitating.

The ALJ also noted a lack of support in the objective medical evidence for the severity of pain Qualls alleges. Although an ALJ may not discount a claimant's pain allegations based solely on a lack of supporting objective evidence, 20 C.F.R. § 404.1529(c)(2), the ALJ may consider that factor "as probative" in assessing the claimant's symptoms, *see Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (noting that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration"). The ALJ cited to treatment records showing unremarkable and essentially normal findings from 2010 through 2011. (See A.R. 59.) For example, she noted Dr. Woods's findings in 2010 that Qualls had no spinal tenderness or spasms, normal strength and range of motion in all major muscle groups, a normal gait, and normal mobility. (Id. at 60.) The ALJ also cited Dr. Osafo's report essentially confirming Dr. Woods's findings. (Id. at 60-61.) The ALJ further relied on two non-examining physicians' reports and the ME's hearing testimony, all of which support her evaluation of Qualls's symptoms. (Id. at 61-63.) Accordingly, the ALJ did not err by taking the lack of objective evidence into consideration when deciding that Qualls's pain is not as severe as she claims. And to the extent the ALJ gave weight to Qualls's statements regarding problems sitting, standing, and walking for prolonged periods of time, she factored those limitations into her RFC by including a sit/stand option and other postural limitations.

As for fatigue, Qualls argues that the ALJ failed to adequately address her complaints of sleepiness. But in the cases she cites to support her argument, the

claimants' fatigue complaints were either unrebutted, *see Cuevas v. Barnhart*, No. 02 CV 4336, 2004 WL 1588277, at *15 (N.D. Ill. July 14, 2004), or not analyzed at all, *see Coppage ex rel. Osborne v. Barnhart*, No. 03 CV 3111, 2004 WL 830475, at *10 (N.D. Ill. Apr. 14, 2004); *Holland v. Barnhart*, No. 02 CV 8398, 2003 WL 22078383, at *9 (N.D. Ill. Sept. 5, 2003). Here, the ALJ acknowledged Qualls's allegations of fatigue, including that she has problems staying alert, falls asleep without notice, and gets drowsy from her medications. (A.R. 58.) But the ALJ noted that there was little objective evidence in the record to support her allegations and cited treatment notes reporting that she was "negative for fatigue" and consistently "alert and oriented." (Id. at 59, 61.) The ALJ also referenced Dr. Woods's opinion, which reported that Qualls felt her fatigue had only a "minor effect" on her ability to perform work duties. (See id. at 406.)

Furthermore, the ME specifically testified at the hearing that none of Qualls's medications, either singly or in combination, concerned him for causing daytime drowsiness. (Id. at 123.) Even so, the ALJ did tailor Qualls's RFC to exclude exposure to dangerous machinery. (Id. at 63.) Accordingly, the court finds no error in the ALJ's assessment of Qualls's allegations of fatigue.

## Conclusion

For the foregoing reasons, Qualls's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**